UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------
```
UNITED STATES OF AMERICA,

    -v-                         09-cr-1067 (JSR)

SOHAIL KHAN,                  OPINION AND ORDER

        Defendant.
```
------------------------------
```

JED S. RAKOFF, U.S.D.J.:

    Before the Court is the motion of defendant Sohail Khan seeking dismissal of the two-count indictment, which was filed under seal on November 3, 2009 and unsealed following Khan's arrest at Chicago's O'Hare International Airport on June 3, 2021. ECF 16 ("Mot."). Khan argues that the period of eleven years and seven months that elapsed between his indictment and arrest was so long that the Government's continued prosecution of this case would violate his right to a speedy trial under the Sixth Amendment to the United States Constitution. The delay arose because Khan, a citizen of Pakistan and a legal permanent resident of the United States, left the United States in September 2004 and did not return for approximately 17 years.

    Upon consideration of the motion, the Government's opposition thereto, and the parties' presentations at oral argument, the Court determined that there were two disputed factual issues that were material to determining if prosecution of this indictment would violate Khan's Sixth Amendment right to a speedy trial: (i) whether Khan left the United States for Pakistan in September 2004 to flee potential

criminal prosecution for the alleged scheme to defraud, or for another innocent reason; and (ii) whether it would have been futile for the Government to have formally requested Khan's extradition from Pakistan. The Court accordingly held an evidentiary hearing on November 16, 2021, at which Khan and three Government witnesses testified regarding the two disputed factual issues.

After consideration of the evidence adduced at the hearing, the parties' post-hearing submissions, and the original motion papers, the Court denies the motion to dismiss.

I.   **Background**

A. **The Alleged Fraudulent Scheme**

Sohail Khan was the owner and manager of Telecorp, Inc. and Saisma Telecommunications, Inc. (Saisma), New York companies that were in the business of providing international call connection services. ECF 1 ("Indictment") ¶ 1. Since phone companies frequently do not have direct relationships with local providers in foreign countries, international calls are often routed through intermediary routers to connect calls placed to such countries. Indictment ¶ 2. Call connection providers aggregate traffic from several sources and direct calls toward local providers in destination countries, often through several intermediate companies. These services are coordinated through brokerage houses that provide anonymous marketplaces for call connection services to buy, sell, route, manage, and settle international voice traffic by connecting with local providers and with each other. Indictment ¶ 3.

Arbinet and Frontline are two such brokerage houses, and Saisma was a member of each. Indictment ¶ 4.

From 2002 through 2004, Khan is alleged to have orchestrated a scheme to defraud major U.S. phone companies, including Verizon, AT&T, and XO Communications. Indictment ¶ 8. The scheme allegedly involved setting up numerous shell companies controlled by nominees and purporting to be call connection providers, through which Khan would route traffic to the U.S. phone companies without paying millions of dollars in call connection fees that were due. Khan allegedly used Saisma to aggregate traffic from Frontline and Arbinet, for which Saisma was paid millions of dollars. Indictment ¶ 9. Saisma would then route traffic to Telecorp and the shell companies, which would connect the calls to the U.S. phone companies. For each shell company, Khan would start by routing a small amount of traffic to the U.S. phone companies for a time to establish a relationship. Indictment ¶ 10. Khan would then shift a large volume of call traffic to that shell company for 2-3 months but would pay none or only a small portion of the millions of dollars in connection fees due to the U.S. phone companies, keeping the remainder of the fees paid by the brokerages. In addition, Khan would move millions of dollars through the bank accounts of the shell companies to make them appear to be legitimate businesses. Indictment ¶¶ 11-12.

B. **The Investigation and Khan's Departure From the United States**

The Government's investigation arose out of an investigation by Verizon corporate security, which detected suspected fraud by Khan's

companies in the summer of 2003. ECF 19-1, Declaration of Allison
Kirshner ¶ 4. In June 2004, Verizon investigators visited two locations
listed as business addresses of Khan's companies, including in the
Empire State Building, where there were a series of interconnected
suites apparently occupied by several of Khan's companies. Id. Although
defense counsel had previously acknowledged that Khan "was aware that
Verizon investigators came to his place of business," ECF 22 at 6,
Khan, when he took the stand, denied being "aware of any kind of
investigation [Verizon was] doing." Tr. 94-95.

Then, on September 25, 2004, Khan flew from John F. Kennedy
International Airport to Dubai International Airport. GX-20 at 2. He
did not return to the United States until approximately 17 years later,
on June 2, 2021, when he was arrested at O'Hare International Airport.
See generally GX-20 (U.S. Dep't of Homeland Sec. border crossing
history). Previously, Khan, a citizen of Pakistan but with legal
permanent resident status in the United States, see Tr. 24, had last
left the United States in 1992. GX-20 at 3. After arriving in Pakistan
in September 2004, Khan repeatedly traveled internationally during his
17-year absence, but he never reentered the United States during that
time. See ECF 17, Affirmation of Valerie Gotlib ¶¶ 13-17.

Khan testified that the reason he traveled to Pakistan in
September 2004 was to care for his ailing mother. Tr. 86. He further
testified that at the time he left the United States in 2004, he had
no knowledge that he was under government investigation for suspected
criminal conduct and that he had not been approached by law

4

enforcement. Tr. 88-90. Gotlib Aff. ¶ 11. Khan maintains that he initially planned to stay in Pakistan for a limited time to care for his mother, who was suffering from mental illness, but that after his arrival, his mother implored him to stay, threatening to harm herself if he left Pakistan again. Tr. 86, 103. Although the Court permitted hearsay to be introduced at the hearing, see Fed. R. Evid. 1101(d)(3), Khan provided no corroboration of this testimony, either in the form of documentary evidence or declarations or testimony from others.

The Government presented no direct evidence that Khan fled criminal prosecution, but it adduced significant circumstantial evidence suggestive of such motive. FBI Special Agent Brian Gander was assigned to the Khan investigation at the time of Khan's departure, and Gander interviewed approximately 30 witnesses. Tr. 16. Gander testified that none of the 30 reported knowing anything about Khan leaving the United States for family reasons. Id. Rather, Gander testified that several of Khan's business partners told him that Khan's departure was abrupt and without warning.

Four of the witnesses about whom Gander and FBI Special Agent Allison Kirshner[1] testified were people who had allegedly opened shell companies involved in the charged fraud. ECF 28 at 3. Each reportedly learned of Khan's departure after he had already left; some spoke to Khan while he was in Pakistan and expected him to return within a

---

[1] Kirshner took over the case in October 2018 and conducted additional witness interviews after Khan's arrest. Tr. 23, 27.

matter of months. Id. at 3-4. One, Omar Mushtaq, reported that he traveled to Pakistan in December 2004 and had several meetings scheduled with Khan, but Khan did not appear at any. Tr. 12. Another, Nazir Hashmi, told Kirshner that he had spent $15,000 to $20,000 to set up an office for the company Khan asked him to open but had seen no sign of corporate activity after three months. Tr. 33-34. Hashmi reported that Khan never told him in advance about departing for Pakistan, and Hashmi only learned that Khan was abroad when he tried, unsuccessfully, to get reimbursed for his setup costs. Id. A third, Tariq Malik, told Gander in January 2005 that he had known Khan for nine years and understood from a mutual acquaintance that Khan had left to produce a movie in India named Nazar with a Bollywood director, and that he would return to the United States in February 2005.[2] Tr. 14-15.

Gander and Kirshner also testified about interviews with four witnesses who were Khan's consultants or employees at the time; none of them reported that Khan had told them in advance about his departure for Pakistan. ECF 28 at 4. One, Khandokar Kader, told Kirshner that he had received notifications from Verizon that Khan owed Verizon money. Tr. 33. After trying unsuccessfully to reach Khan by phone, he visited Khan's Empire State Building offices to find that everything

---

[2] Kirshner testified that after she arrested Khan at O'Hare International Airport, Khan told her that he had used the money from Telecorp to finance the film Nazar, which was produced in 2005. Tr. 26.

had been shut down. Id. Another, Salahuddin Ahmad, was Khan's accountant. Ahmad reportedly learned of Khan's departure from his brother, a travel agent who had agreed to supply Khan with an airplane ticket to Pakistan without prepayment reportedly because Khan said there was an emergency in Pakistan he had to address. Tr. 30. Unlike in past transactions, Ahmad told Kirshner that Khan never repaid Ahmad's brother, though Khan insists he paid for the ticket. Id. at 30, 101.

Kirshner also testified about her interview of Noshin Hassan, an employee of Telecorp from 2003 until 2004, when Telecorp stopped operating, employees stopped showing up to work, and she had gone one to two months without a paycheck. Tr. 35. Hashmi told Kirshner that Khan had not informed her he would be leaving the United States, but she recalled hearing rumors at the time that his departure was related to something going on with Verizon and some fraudulent activity related to T1 lines. Id.

Khan disputes that he left without telling anyone. He first testified that he told "[e]verybody relating to his office" that he was leaving. Tr. 105-106. But upon further questioning, Khan narrowed his claim, asserting that he had only one employee at the time of his departure, Hassan, and that she was the only business associate he informed before leaving. Id. This testimony contradicts what Hassan reportedly told Kirshner in a 2021 interview. Tr. 35. And Khan's claim to only have had one employee also contradicts his later testimony that when he left, he had other individuals working in his office

reviewing business records related to a billing dispute with Verizon, and that Hassan was "supervising everybody, all the other girls." Tr. 112. Khan also claimed to have informed two of his friends, Faiz Sufi and Salim Chaudhry, that he was leaving, but there is no corroboration of this assertion: Sufi is dead, and Salim is in Pakistan. Tr. 107-108.

The record reflects that at the time he departed the United States, Khan had significant outstanding debts to Verizon, over which he was in an ongoing dispute. The Government presented bills from Verizon to Telecorp and Saisma indicating that Khan's entities owed more than $5 million to Verizon at various times before his departure, and Khan testified that he could not recall if he had paid those bills, because he was disputing them. GX-3; GX-4; Tr. 92-94; Tr. 112. Indeed, Telecorp, Khans company, had sued Verizon in New York State Court in September 2003 over the billing disputes and obtained a temporary restraining order ("TRO") enjoining Verizon from terminating its services. See ECF 28-1 (docket sheet for Telecorp, Inc. v. NYNEX Long Distance Company, d/b/a "Verizon Enterprise Solutions," Index No. 602849/2003, Sup. Ct. N.Y. Cty.); 28-5 at 3; Tr. 89. But, as discussed further below, once that injunction was in place, Telecorp quintupled its usage of Verizon's call termination services and continued withholding payment, leading Verizon to eventually seek and obtain dissolution of the TRO, because it was losing approximately $100,000 per day, as Telecorp accrued nearly $3 million in new charges in September 2003. ECF 28-5 at 4.

C. **The Government's Efforts to Apprehend Khan**

At some point in 2005, when the FBI and the U.S. Secret Service ("USSS") were jointly investigating the alleged fraud, the Government learned that Khan had left the United States on September 25, 2004, traveling under his own name to his native Pakistan. Between 2006 and 2009, when the Indictment was returned, FBI and USSS personnel searched various law enforcement databases on several occasions to determine if Khan had returned to the United States, but they found no indication that he had. Kirschner Decl. ¶ 7(a).

On November 3, 2009, the government filed a sealed indictment alleging one count of wire fraud and one count of money laundering. The Government obtained an arrest warrant from a magistrate judge the same day the grand jury returned the indictment. ECF 6. The next day, the FBI entered the warrant into the wanted persons database of the National Crime Information Center ("NCIC"), indicating that Khan should be returned to New York regardless of where he was apprehended but not mentioning international extradition. Kirschner Decl. ¶ 6.

In August 2010, an application for an Interpol Red Notice was submitted to the U.S. National Central Bureau ("USNCB"), which is the U.S. point of contact for Interpol. Kirschner Decl. ¶ 6(c). While the Red Notice application was pending, USNCB promulgated an Interpol "diffusion" to all member countries, including Pakistan, in November 2010.[3] Tr. 38. Interpol then published a Red Notice in September 2011.

---

[3] A "diffusion" is a request for cooperation that is processed through each Interpol member country's national central bureau and,

Id. This Red Notice authorized Khan's provisional arrest in another country for extradition were he encountered, and it included an agreement signed by Assistant U.S. Attorney Sarah Lai authorizing Khan's extradition to the United States. GX-1; Gotlib Aff. ¶ 24. This Red Notice was eventually canceled in April 2021 in response to a routine inquiry from Interpol asking whether to maintain it. Kishner Decl. ¶ 6. In a brief email, AUSA Lai stated that "We won't be prosecuting anymore. The case is too old." Gotlib Aff. ¶ 29 However, the U.S. warrant remained active. Id.

Between 2004 and June 2021, Khan lived openly in Pakistan, under his own name and in properties owned by his family or rented to him. Gotlib Aff. ¶ 12. However, Pakistan never notified the USNCB that Khan was present within its borders. ECF 19-2, Declaration of Jeffrey Olson ¶ 21. He also traveled under his own name from Pakistan to numerous other countries, including the United Kingdom, Germany, Norway, India, Saudi Arabia, and the United Arab Emirates, all of which are members of Interpol. Gotlib Aff. ¶¶ 13-17. The Government reports that it received certain notifications pursuant to the Red Notice, but they came in circumstances that did not permit Khan's apprehension.

The FBI and USSS made various efforts between 2009 and 2021 to locate Khan, including making numerous queries of law enforcement and

---

while less formal than a Red Notice, it "seeks the arrest of a wanted person with a view towards extradition." Tr. 37-38; see also About Notices, INTERPOL, (accessed Dec. 8, 2021), https://www.interpol.int/en/How-we-work/Notices/About-Notices.

private databases, such as the NCIC wanted persons database. Kirshner Decl. ¶ 7. The Government also repeatedly revalidated the warrant's entries in relevant databases and responded to alerts generated by law enforcement databases, though these proved to be false alarms. Id.

The Government never sought Khan's extradition from Pakistan. According to Jeffrey Olson, Associate Director of the DOJ's Office of International Affairs and the official responsible for overseeing extradition requests concerning Pakistan, between Khan's November 2009 indictment and June 2021 arrest, the United States had only one successful extradition from Pakistan, in 2015, despite having "made many other extradition requests to Pakistan" over the past 15 years. Olson Decl. ¶¶ 15-16. Indeed, "more than 90% of the United States' extradition requests during the past 15-year period failed to receive any official response from Pakistan, despite diplomatic efforts to advance them. Olson Decl. ¶ 17.[4] And at the hearing, the Government offered the declaration of another OIA employee, prepared in 2010, that stated that Pakistan had not extradited an individual accused of fraud to the United States since 1988, despite other extradition requests. GX-27.

---

[4] At the start of the evidentiary hearing, the Court granted the Government's motion, filed under seal and subject to an attorneys' eyes only access restriction, to preclude the defense from examining Olson on certain sensitive issues covered by the so-called law enforcement privilege. See Tr. 3; see also In re City of New York, 607 F.3d 923, 948 (2d Cir. 2010). The defense did not meaningfully dispute application of the privilege.

In the 2015 case, the defendant was a U.S. citizen of Pakistani descent who pled guilty in federal court in Ohio to a bribery and embezzlement charge but fled the United States for Pakistan before he was sentenced. Tr. 62, 76-77. Moreover, that defendant was arrested by Pakistani authorities only after he had tried to enter Pakistan on a false passport in violation of Pakistani law. Tr. 62-63. Pakistan again extradited a defendant to the United States in September 2021, three months after Khan's arrest; but in that case the defendant was also a U.S. citizen who ultimately consented to his extradition after years of litigation in Pakistani courts. Olson Decl. n. 1; Tr. 76. Olson further testified that he was unaware of any imminent extraditions from Pakistan. Tr. 75. Since extradition requests are time-intensive to prepare and the United States has had very little success obtaining extradition from Pakistan, OIA regularly advises prosecution teams -- who are ultimately responsible for deciding whether or not to request a defendant's extradition -- to focus on publishing an Interpol Red Notice. See Olson Decl. ¶¶ 18-19; Tr. 77-78.

In June 2021, Kirshner received an alert that Khan was scheduled to arrive in the United States via O'Hare International Airport. Kirshner Decl. ¶ 8. Kirshner and another agent arrested Khan at O'Hare on June 3, 2021, approximately eleven years and seven months after the indictment was filed. Kirshner Decl. ¶ 9.

## II.   <u>Analysis</u>

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." U.S. Const. amend. VI.[5] When the Government has violated the Sixth Amendment right to a speedy trial, "[d]ismissal of the indictment with prejudice is "the only possible remedy." <u>United States v. Moreno</u>, 789 F.3d 72, 78 (2d Cir. 2015).

In <u>Barker v. Wingo</u> the Supreme Court identified four factors that courts should consider in determining whether the Sixth Amendment right to a speedy trial has been violated: "Length of delay, the reason for the delay, the defendant's assertion of his right [before trial], and prejudice to the defendant [arising from the delay]." 707 U.S. 514, 530 (1972). The first factor, the length of delay, operates as a "threshold inquiry." <u>United States v. Cabral</u>, 979 F.3d 150, 157 (2d Cir. 2020). Courts "will only consider the other <u>Barker</u> factors when the defendant makes a showing that "that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." <u>United States v. Ghailani</u>, 733 F.3d 29, 43 (2d Cir. 2013).

Once a court has determined that the delay is presumptively prejudicial, "the burden is upon the government to prove that the delay was justified and that [the defendant's] speedy trial rights

---

[5] Unless otherwise specified, all internal quotation marks, omissions, emphases, and alterations have been omitted from all sources cited herein.

were not violated." <u>United States v. New Buffalo Amusement Corp.</u>, 600 F.2d 368, 377 (2d Cir. 1979). And once the court has moved to a full <u>Barker</u> analysis, "no one factor is a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial, and all must be considered together with such other circumstances as may be relevant." <u>Moreno</u>, 789 F.3d at 78.

### A. **Length of Delay**

The Sixth Amendment speedy trial clock is "triggered by arrest, indictment, or other official accusation." <u>Doggett v. United States</u>, 505 U.S. 647, 655 (1992). Here, the alleged fraudulent scheme occurred between 2002 and 2004, but the parties agree the relevant period of the delay commenced upon filing of the sealed indictment on November 3, 2009 and concluded on June 3, 2021 with Khan's arrest at O'Hare International Airport, resulting in a delay of eleven years and seven months. <u>See</u> Mot. 3; Opp. 5. Moreover, the "Government agrees that the length of time between indictment and arrest in this case is sufficient to trigger further inquiry" under the <u>Barker</u> analysis. ECF 19 at 6.

After the defendant has demonstrated the need for a full <u>Barker</u> analysis, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." <u>Doggett</u>, 505 U.S. at 652. Considered in this second mode, longer delay weighs in favor of dismissal, because "the presumption that pretrial delay has prejudiced the accused intensifies over time." <u>Id.</u>

14

The length of the delay in this case is extraordinary. Indeed, it is longer than the delays in any of the cases cited by the Government in its brief. See Cabral, 979 F.3d at 157-158 (eleven years); United States v. Ocampo, 266 F. App'x 63 (2d Cir. 2008) (nine years and seven months); United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988) (ten years). The length of the delay therefore weighs in favor of dismissal. However, "delay, no matter how lengthy, cannot alone carry a Sixth Amendment claim." Cabral, 979 F.3d at 157.

**B. Reason for Delay**

The second factor is the reason for the delay, and it "is often critical" to the Barker analysis. Moreno, 789 F.3d at 79. "Delay caused by deliberate government misconduct for tactical reasons weighs strongly in favor of finding a speedy trial violation ... [but] the Sixth Amendment is rarely violated if the delay is attributable entirely to the defendant or if the delay serves some legitimate government purpose." Cabral, 979 F.3d at 158. Whether the defendant was a fugitive is relevant to this inquiry, but "even if a defendant flees to avoid capture or prosecution, the government can be at fault for the delay if it failed to use reasonable diligence to locate him and thereby lengthened the delay." Id.

Here, the immediate reason for the delay is clear: Khan left the United States in September 2004 and did not return for nearly 17 years. But whether that delay is to be blamed on the defense or the Government depends on why Khan left the United States and whether the Government

15

exercised reasonable diligence in seeking to apprehend Khan and bring him to trial.

a. Khan's Departure

The Government contends that Khan fled the United States to avoid prosecution for the alleged telecommunications fraud, after learning that corporate investigators from Verizon had visited his place of business. If Khan did flee to avoid potential criminal prosecution, then he "has no one to blame for the ... delay other than himself." Cabral, 979 F.3d at 159-160. But Khan asserts that he was unaware he was under criminal investigation at the time of his departure and instead left the United States to care for his mother, who lived in Pakistan and had purportedly fallen ill. See Gotlib Aff. ¶¶ 7, 11. He then presents a litany of explanations for having stayed so long in Pakistan: his mother's insistence, questions about his U.S. immigration status, and the COVID-19 pandemic.

The Government presents an array of circumstantial evidence suggesting that Khan had reason to believe he might be under criminal investigation. Khan acknowledges that Verizon was hounding him for millions of dollars in unpaid bills for many months before Verizon's private investigators showed up at the interconnected offices of Khan's companies. Like several aspects of Khan's testimony, his discussion of the Verizon investigators' visit was vague and inconsistent. First, counsel acknowledged that Khan knew the investigators visited in 2004, but Khan later gave vague denials of his awareness from the stand. Khan pointed to the lawsuit his company filed against Verizon to

16

indicate that he purportedly viewed the unpaid bills as a purely civil matter. But the materials from the Telecorp v. NYNEX lawsuit tell another story: that Khan obtained a TRO for the purpose of locking Verizon into a service contract so that his company could accelerate its resales of connection services without paying Verizon. See ECF 28-5 at 3. This apparent abuse of the judicial process undermines Khan's suggestion that he thought he was only engaged in a good-faith dispute over the accuracy of Verizon's billing records. Instead, the suit suggests an attempt to extract as much money as possible from Verizon before Telecorp's business relationship was terminated. Moreover, Khan's prior history of criminal justice involvement – in the 1990s, he served sixty months in federal prison on wire fraud and bank fraud charges related to a Medicaid fraud scheme, see United States v. Khan, 92-cr-1001 (S.D.N.Y.); Tr. 90 -- strengthens the inference that even if Khan was unaware at the time of his departure that his business was the target of a criminal investigation, he would be more likely to consider criminal prosecution as a potential outgrowth of the dispute with Verizon over his millions of dollars in outstanding fees.

The circumstances of Khan's 2004 departure also strongly suggest that he fled. Special Agents Gander and Kirshner testified that Khan's associates reported that he left for Pakistan without alerting his business partners or employees and without making preparations for his companies to continue operations.[6] While this evidence was

---

[6] The Court declines to credit Khan's vague and internally inconsistent testimony that he told his employee, Noshin Hassan, that

circumstantial and hearsay, the Court finds it to be more reliable than Khan's inconsistent and uncorroborated testimony that he left to care for a supposed medical emergency involving his mother. Khan never clearly stated what medical condition his mother purportedly suffered from in September 2004, and he provides no records or testimony from others to corroborate that she suffered from a medical problem urgently requiring his presence. Khan's explanation is further undermined by the facts that his mother was only 60 years old in 2004, Tr. 36, and that she ultimately lived until 2016, Tr. 87.

The Court also declines to credit Khan's explanations for why his trip to Pakistan stretched into a 17-year absence from the United States, where he had legal permanent residence and operated multiple businesses. Neither Khan's testimony about pressure from his mother to stay nor his description of his efforts to clarify his U.S. immigration status credibly explain why he remained in Pakistan for so many years. The Government also highlights that Khan ultimately returned less than two months after the Interpol Red Notice was cancelled, suggesting that Khan may have had some information from which he could infer that the United States Government was no longer seeking his arrest.

After considering the record, including the witnesses' consistency and demeanor, and after making the findings described

---

he was leaving the United States, in light of Khan's inconsistency and demeanor and the specific issues raised by Hassan's recollection, as relayed by Special Agent Kirshner, such as Khan's failure to pay her salary for at least one month.

above, the Court concludes that Khan left the United States suddenly and remained abroad for 17 years, for the purpose of avoiding arrest for the alleged fraudulent scheme. Accordingly, Khan has no one but himself to blame for the delay in the Government's prosecution under this indictment.

b. The Government's Effort to Apprehend Khan

The Government has an affirmative obligation to locate and bring a known suspect to trial. See Smith v. Hooey, 393 U.S. 374, 382-383 (1969). Therefore, "whenever an individual has been officially accused of a crime, not only is the government charged with the burden of bringing the accused swiftly to trial, but it is under an obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution." Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988). "[T]he government can be at fault for [a] delay [in bringing a fugitive to trial] if it failed to use reasonable diligence to locate him and thereby lengthened the delay." Cabral, 979 F.3d at 158.

"Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground" but "it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." Doggett, 505 U.S. at 656-57. Only when the Government exhibits negligence in its search will courts generally hold it responsible for delay in bringing a fugitive defendant to trial, and

19

then "only periods of the delay attributable to the negligence should be weighed against the government." Moreno, 789 F.3d at 80.

The inquiry whether the Government "has made sufficient efforts to satisfy the "due diligence" requirement is a fact-specific one ... and the precise amount of effort that is required is apt to vary depending on the circumstances of the case." Rayborn, 858 F.2d at 90. Therefore, "a defendant's status as a fugitive will not relieve the state of its sixth amendment obligations," but "law enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown." Id. Whether the Government employed "exhaustive" efforts to locate a defendant "is not the legal test." Cabral, 979 F.3d at 161. "[R]easonable diligence by law enforcement in locating the defendant is all that is required." Id. Moreover, the Court, "in assessing the degree of diligence, should not judge law enforcement's actions with the benefit of hindsight, but rather consider the mix of information available at the time." Cabral, 979 F.3d at 161.

It is undisputed that the Government took numerous investigative steps domestically to locate and apprehend Khan, including making periodic searches of law enforcement and private databases and maintaining valid entries in the NCIC wanted persons database, so the case agents would be alerted if Khan had an interaction with law enforcement. See Kirshner Decl. ¶¶ 5-6. The Government also made certain efforts to locate and apprehend Khan beyond the United States' borders. These international efforts included promulgating an Interpol

"diffusion" to all member countries, including Pakistan, in November 2010, Tr. 37-38, and causing Interpol to publish a Red Notice to all member countries, including Pakistan, which sought Khan's provisional arrest, Kirshner Decl. ¶ 6(c); GX 1 § 3; GX 2 § 3. And in applying for the Red Notice, the prosecution committed to seek Khan's extradition, should it receive notice of his apprehension abroad. ECF 30 at 8; GX 1 at 6.

Khan nonetheless argues that the Government was negligent because it failed to seek his extradition from Pakistan. It is true, as a general matter, that "the Government has a duty to seek extradition, unless such an effort would be futile." United States v. Leaver, 358 F.Supp.2d 255, 265 (S.D.N.Y. 2004). And while the Second Circuit has repeatedly excused the Government from this duty because an extradition request would have been a futile exercise, in most such cases it has grounded its determination in the legal unavailability of extradition. See, e.g., Cabral, 979 F.3d at 158-159 (the Government "was not required to pursue a futile extradition request" where "extradition to the United States was not feasible ... because [the defendant] was a Brazilian citizen and the Brazilian Constitution forbids extradition of its citizens"); United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988) (holding that it would have been futile to request the extradition of a Colombian citizen when "the existing United States-Colombia extradition treaty did not require Colombia to surrender its citizens under the treaty and the record evidence reveals that, in any event, the Colombian government had a policy of denying extradition

requests involving its citizens," and after a new treaty came into effect requiring extradition of drug smugglers "the President of Colombia had announced that he would not enforce the new treaty"); United States v. Diacolios, 837 F.2d 79, 82-83 (2d Cir. 1988) (holding, in a situation where "no right of extradition exist[ed] under the treaty with [the foreign] country to secure [the defendant's] return" that the Government was not required to seek extradition as a matter of comity "through diplomatic efforts outside the extradition treaty").

Here, the Government acknowledges that Khan's extradition was legally available in this case. The United States and Pakistan have a bilateral extradition treaty. Olson Decl. ¶ 14. And the Government concedes that neither the extradition treaty nor Pakistani law imposes a legal bar to Khan's extradition. ECF 28 at 12; Tr. 77. Khan also emphasizes that the Government had information that he was in Pakistan, and he was living openly under his own name and in properties owned by his family or rented to him. Gotlib Aff. ¶ 12. The decision not to use available legal tools to seek his extradition, Khan argues, thus amounts to Government's negligence.

In response, the Government argues that even though Khan's extradition would have been legally possible, it would have been futile as a practical matter. In support of this proposition, the Government provided the testimony and declaration of OIA's associate director with responsibility for extraditions from Pakistan, Jeffrey Olson. Olson testified that U.S. extradition requests to Pakistan have an

extremely low success rate, with most requests receiving no response. Indeed, the United States has not obtained the extradition from Pakistan of a defendant facing fraud charges since 1988. See GX-27; Tr. 66. And there have only been two successful extraditions on any kind of charges in the last fifteen years, Olson Decl. ¶ 16, and both of these successful extraditions are readily distinguished from Khan's situation. For instance, both cases involved U.S. citizens, whereas Khan is a citizen of Pakistan, which Olson explained would generally make extradition Khan's less likely. See Tr. 77. The successful extraditions were also procedurally distinct: one case involved a defendant who had already pled guilty in the United States and was arrested in Pakistan for a violation of Pakistani law, Tr. 76, and in the other case, the defendant ultimately consented to extradition. Id. Nothing in this record suggests that the Government would have had a reasonable chance of securing Khan's extradition from Pakistan, had it submitted a request to Pakistan.

However, as the defense argues, the relevant question is whether the Government's decision not to seek extradition at the time the decision was made was based on a reasoned conclusion that doing so would be futile, not whether the Court determines in retrospect that an extradition request would not have been successful. See Moreno, 789 F.3d at 79 ("[C]ourts should consider the diligence of the government's efforts based on what was known to the government at the time of the investigation, not what is known by hindsight after the defendant has been apprehended."). And, as the Government concedes, in federal

prosecutions, it is the Assistant United States Attorneys on the prosecution team who are ultimately responsible for deciding whether or not to seek extradition of a fugitive. See Tr. 67, 83.

The evidence presented to the Court does not indicate that this historical record of U.S.-Pakistan extradition relations was before the prosecution team at the time it decided not to transmit a formal request to Pakistan. Moreover, according to DOJ policy, "the first step in any extradition case should be to contact OIA," since "OIA attorneys are subject-matter experts on extradition" and "will advise prosecutors about the potential for extradition in a given case." U.S. Dep't of Just., Just. Manual § 9-15.210 (2018). In this case, however, neither the prosecution team nor OIA has any record of the prosecution team consulting OIA regarding the prospects of extraditing Khan. Tr. 81-82. Because of the age of the case, the prosecutor cannot remember whether she contacted OIA, and her relevant email records for that period have not been retained. ECF 22 at 9-10.

The prosecutor avers instead that she relied on "general training and experience" to determine that it would be futile to attempt to extradite Khan from Pakistan, but she had not prosecuted any prior case involving a fugitive in Pakistan. Tr. 84-85. On this record, the Court concludes that the Government's decision to forego an extradition request, examined in light of the information before the prosecution team at the time, was not based on substantial evidence that an extradition request would have been a futile exercise. The Court

therefore holds that the Government failed to exercise due diligence in locating and apprehending Khan.[7]

However, under the Barker inquiry, "even if the government acted negligently, negligence does not weigh in favor of the defendant unless it actually lengthened the delay. That is because negligence is not a reason for the delay unless there is a causal connection." Moreno, 789 F.3d at 80. Here, the historical record is clear that the United States has had very little success obtaining extradition of anyone from Pakistan -- and no recent success whatsoever in obtaining extradition of Pakistani citizens on fraud charges. The Court therefore concludes that it is highly doubtful that the Government's failure to seek Khan's extradition from Pakistan actually lengthened the delay between his indictment and trial. And since there is no "period[] of delay attributable to negligence," the negligence was not a "reason for delay," and none of the roughly eleven and a half years between Khan's indictment and arrest "should be weighed against the Government." Id.

---

[7] The Court's conclusion that the Government acted negligently by declining to seek Khan's extradition is closely tied to the evidentiary record. As discussed, the Government bears the burden of showing that there was an adequate justification for the presumptively prejudicial delay in bringing this case to trial, see New Buffalo Amusement Corp., 600 F.2d at 377, and the Government failed to adduce any evidence regarding the basis of the prosecution team's decision not to seek Khan's extradition. Accordingly, the Court need not, and does not, decide whether the Government would be excused from its duty to request a defendant's legally available extradition if there were evidence that the prosecution team conferred with OIA's subject-matter experts and determined therefrom, in an exercise of objectively reasonable discretion, that the historical record of extradition meant that an extradition request in that particular case would be futile as a practical matter.

In sum, the Court concludes that Khan's apparent decision to flee from criminal investigation and prosecution is responsible for the unusually long delay in this case. While the Government failed to show that the prosecution team made the decision not to seek Khan's extradition on the basis of substantial evidence of futility, the Government is not charged with responsibility for the delay because it has established that an extradition request would almost certainly have failed to bring Khan to trial any more quickly. This second, critical factor, the reason for delay, therefore weighs heavily against Khan.

### C. <u>Timely Assertion of Rights</u>

The parties also agree that the defendant timely asserted his rights under the Sixth Amendment's speedy trial clause by filing the instant motion. Since the defendant maintains that he was unaware of the sealed indictment until his arrest, Khan "is not to be taxed for invoking his speed trial right only after his arrest." <u>Doggett</u>, 505 U.S. at 654. The third <u>Barker</u> factor thus bears little weight here.

### D. <u>Prejudice From Delay</u>

The fourth factor is the prejudice to Khan arising from the delay. <u>See</u> <u>Barker</u>, 707 U.S. at 530. "[U]nreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence." <u>Doggett</u>, 505 U.S. at 654. Here, Khan maintains that he was

unaware of the criminal investigation or indictment until his arrest, and he has not claimed that he suffered any anxiety or concern during the long delay. And since Khan was not detained during the prolonged delay, there was no oppressive pretrial incarceration. Therefore, the only cognizable prejudice to Khan arises from the fact that some of the evidence necessary to build his defense case may have gone stale or been lost because over the years between the time of the alleged fraudulent scheme (2002-2004) and today.

The Government insists that the defense would suffer no prejudice from trying this case now and that the defense cannot establish actual prejudice since its briefing does not identify any particular missing witnesses or particular missing documents and so cannot establish "specific prejudice to his defense." Cabral, 979 F.3d at 163; see ECF 19 at 15-16. But the Supreme Court has rejected the Government's position that a defendant must "make an[] affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence." Doggett, 505 U.S. at 655. Rather, "consideration of prejudice is not limited to the specifically demonstrable, and ... affirmative proof of particularized prejudice is not essential to every speedy trial claim," since "time's erosion of exculpatory evidence and testimony can rarely be shown." Id.

Moreover, defense counsel proffered at oral argument several categories of evidence that may have eroded. For instance, Khan avers he can no longer access any of the contracts or other records from the

entities alleged in the indictment to be shell companies. And with respect to witnesses, defense counsel proffers that she has been unable to locate most of the supposedly 30-40 potentially relevant individuals and entities she identified from the discovery materials produced by the Government, though she acknowledged that there were other investigative avenues to explore. ECF 22 at 19-21.

That impediments to investigation exist after so many years is no surprise. But they are perhaps not quite as weighty as they first appear. There is every indication that this case will largely turn on documents, rather than testimony. And the Government argues that it has turned over a significant population of the relevant records in discovery that were gathered years ago under the auspices of the grand jury investigation and that these records will provide the defense with evidence from which to build its case. Nonetheless, this only goes so far, and the Court ultimately concludes that the delay in bringing this case to trial might reasonably impair Khan's defense. So the fourth Barker factor weighs in Khan's favor.

### III.  Conclusion

Like most motions made under the Sixth Amendment's Speedy Trial Clause, this one turns on the second and fourth factors: the reason for the delay in bringing the case to trial and any prejudice to the Defendant arising therefrom. Here, those factors point in opposite directions. Khan will likely face certain challenges in collecting the documents necessary to answer the indictment. But Khan is ultimately to blame for the delay, and thus for any accumulated prejudice, because

the Court finds that he left the United States and remained abroad for 17 years for the purpose of fleeing prosecution for the alleged fraudulent scheme. Among other factors, Khan's decision to return to the United States less than two months after the Red Notice's cancellation -- a fact from which the Court infers that Khan sought to wait until the coast was clear before returning to these shores -- militates against dismissing the indictment on the ground that delay may pose a challenge to Khan's defense, because Khan's decision to lengthen the delay led directly to the prejudice of which he now complains.

Therefore, after consideration of all four <u>Barker</u> factors and the other circumstances relevant to this case, the Court denies Khan's motion to dismiss. The Parties are directed to initiate a joint phone conference with Chambers within one week of the entry of this Order to set a trial date.

SO ORDERED.

New York, NY
December 15, 2021

_____
JED S. RAKOFF, U.S.D.J.